IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| TAD TAYLOR, § | | |
| BOP Register No. 26966-078, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| V. § | No. 3:21-cv-3175-E-BN | |
| § | | |
| THE SACKLER FAMILY OF PURDUE § | | |
| OWNERSHIP, ET AL., § | | |
| § | | |
| Defendants. § | | |

# FINDINGS, CONCLUSIONS, AND RECOMMENDATION OF THE
## UNITED STATES MAGISTRATE JUDGE

> [Plaintiff] Theodore "Tad" Taylor and Chia Jean Lee, a married couple who met while earning their degrees at Yale, ran Taylor Texas Medicine in Richardson, Texas. Taylor was the clinic's only doctor while Lee, a nurse by training, was the clinic's office manager. An Eastern District of Texas grand jury indicted the couple for conspiring to distribute controlled substances. The indictment alleged that from 2010 through early 2012, Taylor and Lee conspired to illegally prescribe five controlled substances: oxycodone, amphetamine salts, hydrocodone, alprazolam, and promethazine with codeine.
>
> A jury convicted both of them after a seven-day trial. It also made findings about the quantity of drugs the couple distributed, but those quantities did not trigger higher statutory minimum or maximum sentences. *See* 21 U.S.C. § 841(b)(1)(C). The district court then sentenced Taylor to the 20-year statutory maximum (his Guidelines range would have been higher but for the statutory cap) and Lee to just over 15 years (the bottom of her Guidelines range).

*United States v. Lee*, 966 F.3d 310, 316 (5th Cir. 2020). Taylor's projected release date

is October 24, 2035. *See United States v. Taylor*, No. 4:17-CR-9(1), 2020 WL 5222797

(E.D. Tex. Sept. 1, 2020).

Taylor, incarcerated in this district, now brings a *pro se* civil lawsuit against

the Sackler Family, the founders of Purdue Pharma, alleging, in essence, that they

are liable for his current predicament due to "deficiencies, misrepresentations, misleading promotional materials, aggressive sales and marketing tactics, and deceptive trade practices, all designed to fraudulently promote the safety, efficacy, and convenience of opioid prescribing in an effort to stimulate physician prescription conveyance thus resulting in a compromised environment within the physician's practice leading to violations of compliance, legal standing, and of course, patient safety." Dkt. No. 3 at 1.

Taylor further specifies that his damages include his criminal conviction: "Damages to this Plaintiff as a previously practicing pain medicine physician, shall include, but shall not be limited to, damaged reputation, foregone license, lost income, missed opportunity, seized investments and assets, loss of freedom, stress and anxiety." *Id.*

Taylor neither paid the $402 filing fee nor moved for leave to proceed *in forma pauperis* (IFP). United States District Judge Ada Brown referred his complaint to the undersigned United States magistrate judge for pretrial management under 28 U.S.C. § 636(b) and a standing order of reference. And the undersigned enters these findings of fact, conclusions of law, and recommendation that the Court should dismiss Taylor's claims without prejudice.

**Legal Standards and Analysis**

Taylor qualifies as a prisoner under the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915A(c). But he does not seek "redress from a governmental entity or officer or employee of a governmental entity." *Id.* § 1915A(a). So the Court cannot screen his

complaint under 28 U.S.C. § 1915A.

Regardless, a district court is required to screen a civil action filed IFP and may summarily dismiss that action, or any portion of the action, if, for example, it fails to state a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). "The language of § 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6)." *Black v. Warren*, 134 F.3d 732, 733-34 (5th Cir. 1998) (per curiam).

And, even outside the IFP context, "[i]t is well-established that a district court may dismiss a complaint on its own motion under [Rule] 12(b)(6) for failure to state a claim upon which relief may granted." *Starrett v. U.S. Dep't of Defense*, No. 3:18-cv-2851-M-BH, 2018 WL 6069969, at *1 (N.D. Tex. Oct. 30, 2018) (citing *Carroll v. Fort James Corp.*, 470 F.3d 1171 (5th Cir. 2006) (citing, in turn, *Shawnee Int'l, N.V. v. Hondo Drilling Co.*, 742 F.2d 234, 236 (5th Cir. 1984))), *rec. accepted*, 2018 WL 6068991 (N.D. Tex. Nov. 20, 2018), *aff'd*, 763 F. App'x 383 (5th Cir.) (per curiam), *cert. denied*, 140 S. Ct. 142 (2019).

A district court may exercise its "inherent authority ... to dismiss a complaint on its own motion ... 'as long as the procedure employed is fair.'" *Gaffney v. State Farm Fire & Cas. Co.*, 294 F. App'x 975, 977 (5th Cir. 2008) (per curiam) (quoting *Carroll*, 470 F.3d at 1177 (quoting, in turn, *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)); citation omitted). And the United States Court of Appeals for Fifth Circuit has "suggested that fairness in this context requires both notice of the court's intention to dismiss *sua sponte* and an opportunity to respond." *Id.* (cleaned up; quoting *Lozano*

*v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 643 (5th Cir. 2007) (quoting, in turn, *Carroll*, 470 F.3d at 1177)); *accord Carver v. Atwood*, 18 F.4th 494, 498 (5th Cir. 2021) ("The broad rule is that 'a district court may dismiss a claim on its own motion as long as the procedure employed is fair.' More specifically, 'fairness in this context requires both notice of the court's intention and an opportunity to respond' before dismissing *sua sponte* with prejudice." (citations omitted)).

Notice is provided through these findings, conclusions, and recommendations (the FCR), and the period to file objections to the FCR (further explained below) affords an opportunity to respond. *See, e.g.*, *Starrett*, 2018 WL 6069969, at *2 (citations omitted).

Before examining Taylor's claims, however, the Court must examine its own subject matter jurisdiction, to ensure that it is operating "within the bounds the Constitution and Congress have prescribed." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). "Under the dictates of Article III of the United States Constitution, federal courts are confined to adjudicating actual 'cases' and 'controversies.'" *Henderson v. Stalder*, 287 F.3d 374, 378 (5th Cir. 2002) (quoting U.S. CONST. art. III, § 2, cl. 1). "There is no case or controversy without standing to sue." *Williams v. Parker*, 843 F.3d 617, 620 (5th Cir. 2016) (citing *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). So Article III "[s]tanding is a threshold issue that [a federal court must] consider before examining the merits." *Id.* (citing *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013)).[1]

---

[1] *See also Henderson*, 287 F.3d at 378 ("Of the doctrines that have evolved

To obtain "Article III standing, a plaintiff must allege that it has been injured, that the defendant caused the injury, and that the requested relief will redress the injury." *Cotton v. Certain Underwriters at Lloyd's of London*, 831 F.3d 592, 595 (5th Cir. 2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). "'That triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement,' and [Taylor], as 'the party invoking federal jurisdiction, bears the burden of establishing its existence.'" *Inclusive Communities Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (cleaned up; quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04 (1998)).

Plausible allegations will carry Taylor's burden at this time, as "each element of Article III standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 366 (5th Cir. 2018) (citations and internal quotation marks omitted).

Taylor has alleged an injury. And his request for monetary damages plausibly alleges redressability, since even nominal damages are enough for this prong. *See*

---

under Article III, including standing, mootness, ripeness, and political question, the requirement that the litigant have standing is perhaps the most important." (citing *Allen v. Wright*, 468 U.S. 737, 750 (1984))); *Twn. of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) ("'Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.' 'The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches.' Our standing doctrine accomplishes this by requiring plaintiffs to 'alleg[e] such a personal stake in the outcome of the controversy as to ... justify [the] exercise of the court's remedial powers on [their] behalf.'" (citations omitted)).

*Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801-02 (2021).

As to causation, however,

[e]ven though Article III requires a causal connection between the plaintiff's injury and the defendant's challenged conduct, it doesn't require a showing of proximate cause or that "the defendant's actions are the very last step in the chain of causation." Causation, for example, isn't precluded where the defendant's actions produce a "determinative or coercive effect upon the action of someone else," resulting in injury. But [Taylor's] injuries can't be "the result of the independent action of some third party not before the court."

*Inclusive Communities Project*, 946 F.3d at 655 (quoting *Bennett v. Spear*, 520 U.S. 154, 169, 167 (1997)).

"Nor can [Taylor's injuries] be 'self-inflicted.'" *Id.* (quoting *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 358 (5th Cir. 1999)).

"An injury is self-inflicted so as to defeat the causation necessary to establish standing, however, 'only if ... the injury is so completely due to the plaintiff's own fault as to break the causal chain.'" *NRDC, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 403 (2d Cir. 2000)); *accord Petro-Chem Processing, Inc. v. E.P.A.*, 866 F.2d 433, 438 (D.C. Cir. 1989). "[C]onsequently, a 'self-inflicted harm' – i.e., an 'injury ... largely of [the plaintiff's] own making' – is neither 'an "injury" cognizable under Article III' nor an injury that is 'fairly traceable to the defendant's challenged conduct.'" *Maryland v. U.S. Dep't of Educ.*, 474 F. Supp. 3d 13, 35 (D.D.C. 2020) (quoting *Nat'l Family Planning & Reprod. Health Ass'n, v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006)), *vacated as moot*, 2020 WL 7868112 (D.C. Cir. Dec. 22, 2020); *see also* 2020 WL 7773390 (D.D.C. Dec. 29, 2020) (op. on remand after vacatur).

Put another way, the traceability requirement of Article III standing cannot be met where plaintiffs' "voluntary acts are sufficient independent causes of their" alleged injuries. *Taylor v. F.D.I.C.*, 132 F.3d 753, 767 (D.C. Cir. 1997). Here, Taylor's specified injuries – his "damaged reputation, foregone license, lost income, missed opportunity, seized investments and assets, loss of freedom, stress and anxiety," Dkt. No. 3 at 1 – all chiefly stem from his voluntary criminal activity. That is, his crimes are "sufficient independent causes of [his] alleged injuries." *Taylor*, 132 F.3d at 767; *see also Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006) ("A plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of its own alleged injury."); *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 518 (7th Cir. 2010) ("Had Parvati not voluntarily dismissed its claims for monetary relief in the first case, it would have faced no risk of preclusion; the district court would have considered all of Parvati's grievances in one lawsuit."); *Big Blue Capital Partners, LLC v. Recontrust Co.*, No. 6:11-CV-06368-AA, 2012 WL 1605784, at *5 (D. Or. May 4, 2012) ("[T]o the extent that plaintiff suffered an injury, it was due to plaintiff's own actions in purchasing the Property after non-judicial foreclosure proceedings had been commenced.").

Because Taylor has not plausibly alleged each element of Article III standing, required to carry his burden to invoke the Court's subject matter jurisdiction, the Court should dismiss this lawsuit without prejudice.

Alternatively, should the Court conclude that Taylor has Article III standing,

his civil claims for monetary damages are subject to the rule in *Heck v. Humphrey*, 512 U.S. 477 (1994), and should still be dismissed without prejudice because they have yet to accrue. *See McDonough v. Smith*, 139 S. Ct. 2149, 2157 (2019) (*Heck*'s "favorable-termination requirement" "applies whenever 'a judgment in favor of the plaintiff would necessarily imply' that his prior conviction or sentence was invalid." (quoting *Heck*, 512 U.S. at 487)); *Colvin v. LaBlanc*, 2 F.4th 494, 499 (5th Cir. 2021) ("Pursuant to *Heck*, the primary question here is whether success on Colvin's claims would necessarily implicate the validity of his conviction or confinement.").

Under the *Heck* rule, "factual allegations [that] are necessarily inconsistent with the validity of [a] conviction" that a plaintiff fails to show has been reversed on direct appeal, expunged by executive order, or otherwise declared invalid by a state tribunal or federal court should be dismissed. *McCann v. Neilsen*, 466 F.3d 619, 621 (7th Cir. 2006) (cited in *Bush v. Strain*, 513 F.3d 492, 498 n.14 (5th Cir. 2008)); *accord Magee v. Reed*, 912 F.3d 820, 822 (5th Cir. 2019) (per curiam); *see also O'Donnell v. Harpstead*, No. 21-cv-0177 (ECT/TNL), 2021 WL 1200671, at *2 (D. Minn. Feb. 26, 2021) ("[A]lthough *Heck* discusses only claims brought for monetary damages, the principles of that case apply to all claims brought in civil litigation that necessarily imply the invalidity of detention, including claims for injunctive relief." (citing *Jones-El v. Joyce*, No. 4:09-CV-1972, 2009 WL 5217006, at *2 (E.D. Mo. Dec. 30, 2009) (collecting cases))), *rec. accepted*, 2021 WL 1195863 (D. Minn. Mar. 30, 2021).

"Meanwhile, *Heck* is not 'implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence.'" *Santos v. White*,

18 F.4th 472, 476 (5th Cir. 2021) (quoting *Muhammad v. Close*, 540 U.S. 749, 751 (2004) (per curiam)). "Rather, a claim is barred only if granting it 'requires negation of an element of the criminal offense or proof of a fact that is inherently inconsistent with one underlying the criminal conviction.'" *Id.* (quoting *Bush*, 513 F.3d at 497). That is the case here. Taylor's current factual allegations directly contradict the evidence that supports his conviction.

Affirming that sufficient evidence supported Taylor conviction, the Fifth Circuit recounted the following:

> Even by the standards of our adversarial system, the difference in the parties' portrayals of the clinic is stark. The defendants' story is that they ran Taylor Texas Medicine as a legitimate pain management operation. Taylor says that he carefully examined patients, refused to prescribe to patients who tested positive for illegal drugs, and attempted conservative treatments before resorting to others prone to abuse. He acknowledges that, in retrospect, he may have made some mistakes. But he contends he acted in good faith and trusted his patients to accurately report their pain….
> 
> The government tells the story of a "pill mill" – a medical practice that serves as a front for dealing prescription drugs. It portrays a clinic packed with drug users and dealers, where one person would often pay for multiple patients' visits. Also consistent with patients' trafficking drugs is that, on follow-up visits, many tested negative for the medication Taylor had prescribed them. Others tested positive for illegal drugs like cocaine. Despite the red flags, Taylor kept prescribing these patients drugs. Even when a patient's wife begged Taylor to stop feeding her husband's drug addiction, he kept prescribing the husband drugs. And when a pharmacist who filled many of Taylor's prescriptions told him that some of his patients were also receiving scripts from other doctors, he kept prescribing them drugs too. The pharmacist was so troubled that she contacted the Drug Enforcement Administration for the first time in her career….
> 
> Because the jury found the defendants guilty, we must honor the government's telling if it is backed by evidence. It is. The government called seventeen witnesses, including the pharmacist who reported Taylor to the DEA, the patient's wife who asked Taylor to stop prescribing drugs to her husband, undercover officers who pretended to

be patients, an actual patient, medical experts, clinic staff, and case agents. It also introduced documentary evidence like financial records, patient files, and prescription data. Taylor testified too. All this evidence was more than enough for the jury to convict on. What follows is just a sampling.

Taylor is not a pain management specialist, yet the clinic shifted its focus to pain patients when he and Lee began having financial difficulties. Eventually 80% of the clinic's patients were pain patients. The proportion of prescriptions Taylor wrote for the commonly abused drugs hydrocodone and alprazolam grew from about 50% of prescriptions in January 2010 to over 80% by August 2011. Almost all those prescriptions were for the maximum dosage. He seldom offered patients conservative treatments not prone to abuse.

Taylor did little to justify the prescriptions. By 2011, he was seeing 40 to 50 patients a day. The undercover visits confirmed the brevity of the examinations; Taylor spent between two-and-a-half and eleven minutes per visit with the pretend patients. One of the medical experts, Graves Owen, estimated that a pain doctor complying with the standard of care might spend 30 to 60 minutes with a new patient and between 10 and 15 minutes for an ordinary follow-up.

What time Taylor spent with patients often involved only a cursory physical examination. A patient, the undercover officers, and the medical experts all testified that Taylor's physicals were brief and that he rarely requested imaging to corroborate claims of pain. Sometimes Taylor would enter the examination room with a prefilled prescription form. Agents even found presigned (but otherwise blank) prescription forms when they searched the clinic. For some patients, Taylor wrote prescriptions without any examination at all; they could just stop by the clinic and pick them up.

For at least some of these prescriptions, Taylor had direct knowledge that the patients exhibited obvious drug-seeking behavior. Recall that a pharmacist told Taylor he was prescribing drugs to patients who were getting the same drugs from other doctors. And a patient's wife called and emailed Taylor asking him not to prescribe to her husband because he had substance abuse problems and was getting prescriptions from other doctors. He ignored their concerns. The undercover operation again corroborated what was happening with clinic patients: Taylor prescribed drugs when the undercovers indicated their pain was fake. One testified that Taylor "coach[ed]" him to come up with an injury to "legitimize" a prescription.

The defendants' responses to patient drug tests are also telling. A positive test for an illegal drug, such as cocaine, is a warning sign in flashing neon. Less apparent but no less damning is a negative test for a prescribed drug: it is a red flag that the so-called patient is selling

> medications rather than using them. Yet when many of Taylor's patients "failed" drug tests – either testing positive for illegal drugs or testing negative for the drugs Taylor had prescribed them – he continued to sign off on scripts. More than that, the clinic's irregular pricing structure nakedly compensated Taylor and Lee for assuming the risk of prescribing to these patients with troubling drug tests. It charged a premium to patients who tested positive for illegal substances and gave a discount to patients who tested positive for the drugs they had been prescribed.
>
> As the clinic built up its pain management practice, monthly revenues rose fivefold, from just over $20,000 in early 2010 to more than $100,000 by mid-2011. Most of the clinic's receipts were in cash. Pain patients could not use insurance for their first visit, and they could never use Medicaid. Still, patients traveled from all over the Dallas-Fort Worth metroplex to see Taylor. Many patients seemed to know each other, and one man would sometimes pay for several patients' prescriptions.
>
> To make matters worse for Taylor, the jury could have also concluded that he lied to try and hide his guilt. Taylor told DEA agents that he discharged patients who tested positive for illegal drugs (with the exception of marijuana). As we have discussed, the evidence told a much different story. Then, when he took the stand, Taylor repeatedly claimed he could not remember key facts such as whether he continued to prescribe to the patients who were receiving pain medication from other doctors. Patient records show that he did. These statements that the jury could view as coverups are yet more evidence that Taylor knew what he was doing was wrong.

*Lee*, 966 F.3d at 317-19 (citations omitted).

Despite the substantial evidence that he operated an illegal pill mill, Taylor now contends that the Sacklers are solely to blame for his "f[alling] outside of legal compliance," alleging, for example, that he

> proceeded to rely upon the guidance and advisement of the manufacturer's marketing and sales representatives, its literature and promotional materials, and its scientific, efficacy, and formulary protocols, all of which proved to be misleading, misrepresented, fraudulent, and outside of Drug Enforcement Administration legal compliance guidelines, thus resulting in this Plaintiff violating certain compliance standards, potentially endangering his patient base, and subsequently resulting in a seizure of his practice, his license, and his freedom upon conviction and imprisonment, all while prescribing

>   medications in accordance with the Defendant's recommendations and acceptable dosing levels. Despite this Plaintiff, as a practitioner representing pain patients within the prescribing guidelines provided to him through the manufacturer (Defendant); and in light of a required diagnosis of every patient, established blood and lab analysis before any unauthorized prescribing, and extensive screening which resulted .in over 200 discharges, all while prescribing fewer than a maximum of 1.2 grams per patient and two prescriptions compared to a defined "Pill Mill" as prescribing 1,200 grams per patient, yet, even under strict compliance protocols, by following the formulary recommendations and safety standards of the manufacturer, this Plaintiff, as a practicing physician, still fell outside of legal compliance, all as a result of the deceptive trade practices and fraudulent standards presented by Defendants.

Dkt. No. 3 at 8 (cleaned up); *see also id.* at 11 ("Upon raid and arrest, the DEA alleged under Discovery of Evidence that the clinic and specifically, Dr. Tad Taylor (as criminal Defendant in case) prescribed excessive amounts of Schedule II, III, and IV controlled substance narcotics beyond proper and reasonable limits based on the number of patients under treatment. The Discovery of tainted evidence confirmed that prosecutors confiscated 1150 patient charts and selected Seven (7) patient prescriptions as exceeding DEA charting limits in accordance with FDA standards, yet the Manufacturer's literature and advisement remained in excess of such standards, and provided the treating physician (Plaintiff) with confidence that his prescribing fell well within charting protocols. In other words, this Physician, now as Plaintiff, remained within the guise and guidance of manufacturer's dosing and prescribing recommendations, thus resulting in this compliant physician placing his patient base in danger upon false, fraudulent, and misleading marketing, promotion, and sales tactics to advance larger quantities of their product.").

In sum, because success on the civil claims that Taylor brings now would

require proof of facts that are "inherently inconsistent with" the facts underlying a criminal conviction that has yet to terminate in his favor, the civil claims are subject to the rule in *Heck* and have yet to accrue. *Bush*, 513 F.3d at 497; *see Colvin*, 2 F.4th at 498-99 (*Heck* "based its holding on the 'hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments,' and analyzed when and how a [civil] cause of action accrues." (footnote omitted)); *see also Cook v. City of Tyler, Tex.*, 974 F.3d 537, 538-39 (5th Cir. 2020) (per curiam) ("[B]ecause Cook's conviction has yet to be formally terminated in his favor, his causes of action concerning serious official misconduct have not yet accrued and will not begin to accrue until the Texas Court of Criminal Appeals … vacates his conviction and the State dismisses the indictment against him." (citation and footnote omitted)).

So, even if the Court finds that Taylor has adequately alleged Article III standing, his civil claims should still be dismissed without prejudice.

## Recommendation

The Court should dismiss this action without prejudice.

A copy of these findings, conclusions, and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and

specify the place in the magistrate judge's findings, conclusions, and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

DATED: December 28, 2021

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE